# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Reginald C. Howard,

      Plaintiff

v.

Greg Cox, et al.,

      Defendants

Case No.: 2:17-cv-01002-JAD-BNW

**Order re: Cross-Motions for Summary Judgment and Motions for Related Relief**

[ECF Nos. 58, 62, 64, 70, 71, 79]

After two screening orders, an opportunity to amend with instructions, and a partially granted dismissal motion, pro se prisoner Reginald Howard was left with five claims for relief, which he brings against the defendants in their individual and official capacities. Discovery is closed,[1] and Howard now moves for summary judgment on all of his claims.[2] Defendants cross move for summary judgment in their favor,[3] and they move to seal Howard's medical records that they provide in support of their motion.[4] Howard objects that two declarations that defendants provide are inadmissible.[5] He filed a notice stating that Ely State Prison didn't allow him to review his full medical file and he did not receive a copy of defendants' summary-judgment motion or motion to seal medical records.[6] And Howard recently filed a motion asking the court to investigate his claims that a corrections officer "has been yelling out" in Howard's

---

[1] *See* ECF No. 57 (order extending discovery deadlines).

[2] ECF No. 58.

[3] ECF No. 62.

[4] ECF No. 64.

[5] ECF No. 71.

[6] ECF No. 70.

1  unit that "Howard is a snitch because of [his] numerous grievances and complaints" because the

2  prison is ignoring his grievances about that issue.[7]

3          Defendants have demonstrated that compelling reasons exist to seal Howard's medical

4  records and the summary of them by a Nevada Department of Corrections (NDOC) nurse, so I

5  grant them that relief.  Howard does not ask for any relief associated with his notice about

6  pleading and evidence availability, and I do not find that he is entitled to any relief about those

7  matters under the circumstances.  I overrule Howard's evidentiary objections because they lack

8  merit.  I construe his motion for an investigation into matters that are unrelated to the claims at

9  issue in this action as a motion to reopen and enlarge the time for Howard to amend his

10 pleadings.  Howard has not shown excusable neglect and good cause necessary to obtain that

11 relief, so I deny his motion without prejudice to his ability to bring his new claims in a new

12 action.

13         I grant in part and deny in part the parties' cross-motions for summary judgment.

14 Howard's claims alleging Eighth Amendment deliberate indifference to serious medical needs

15 and First Amendment retaliation against Groover under Count 5 can proceed to trial.  Finally,

16 with the trial issues narrowed, I refer this case for a mandatory settlement conference with the

17 magistrate judge.

**Discussion**

18

19 **I.     Motion to seal [ECF No. 64]**

20          "The public has a 'general right to inspect and copy public records and documents

21 including judicial records and documents.'"[8]  "Although the common law right of access is not

22  _____

[7] ECF No. 79.

23 [8] *In re Midland Nat. Life Ins. Co. Annuity Sales Practices Litig.*, 686 F.3d 1115, 1119 (9th Cir. 2012) (quoting *Nixon v. Warner Commcns., Inc.*, 435 U.S. 589, 597 (1978)).

absolute, '[courts] start with a strong presumption in favor of access to court records.'"[9]  "A party seeking to seal judicial records [attached to a dispositive motion] can overcome the strong presumption of access by providing 'sufficiently compelling reasons' that override the public policies favoring disclosure."[10]  "When ruling on a motion to seal court records, the district court must balance the competing interests of the public and the party seeking to seal judicial records."[11]  "To seal the records, the district court must articulate a factual basis for each compelling reason to seal[,] [which] must continue to exist to keep judicial records sealed."[12]

To support their summary-judgment arguments, defendants proffer Howard's medical records and the declaration of Sonya Carrillo, a Director of Nursing Services II at High Desert State Prison (HDSP), who authenticates Howard's medical records and transcribes and summarizes them.[13]  Defendants move to seal these records, arguing that although Howard placed certain aspects of his medical condition at issue when he filed this action, the public has no need for direct access to the medical records themselves or the unrelated medical information that they contain.[14]  Many courts in the Ninth Circuit "have recognized that the need to protect medical privacy qualifies as a 'compelling reason' for sealing records."[15]

The exhibits that defendants seek to seal contain detailed information about Howard's health, medical history, and treatment and not just the health conditions that are at issue in this

---

[9] *Id.* (quoting *Foltz v. St. Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003)).

[10] *Id.* (quoting *Foltz*, 331 F.3d at 1135).

[11] *Id.* (citing *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006)).

[12] *Id.* (citing *Kamakana*, 447 F.3d at 1179; *Foltz*, 331 F.3d at 1136).

[13] ECF No. 65 (sealed).

[14] ECF No. 64.

[15] *Steven City Broomfield v. Aranas*, 2020 WL 2549945, at *2 (D. Nev. May 19, 2020) (collecting cases).

action.  The exhibits are copies of Howard's medical records themselves and a plain-English summary of those records by an NDOC nurse.  Howard's interest in protecting his medical records and a nurse's summary of them outweigh the public's need to access them.  I therefore grant defendants' motion to seal those records.  But I do not require the parties to redact the parts of those records that they quote or paraphrase in their briefs because those points are relevant to Howard's claims in this action.  For the same reason I likewise do not redact the parts of those records that I quote or paraphrase in this order.

## II.   Howard's notice of non-receipt of evidence and briefs [ECF No. 70]

Howard filed a notice informing the court that the Ely State Prison (ESP) did not allow him to review his medical file, which he requested in discovery.[16]  Howard also claims that he did not receive copies of defendants' summary-judgment motion (ECF No. 62) or their sealed submission of his unredacted medical records and summary (ECF No. 65).[17]  And he complains that defendants failed to respond to his motion requesting a summons and last known address for Sgt. Sanchez.[18]

Defendants respond with evidence that Howard was allowed to access his medical records and surveillance videos on September 3, 2020.[19]  They provide a copy of a memorandum from ESP's warden W.A. Gittere scheduling an appointment for Howard to view his medical records and two surveillance disks in private on that day.[20]  The document purports to be signed by Howard in two places: (1) acknowledging the appointment, and (2) confirming the document

---

[16] ECF No. 70.

[17] *Id.*

[18] *Id.*

[19] ECF Nos. 72, 73 (corrected image).

[20] ECF No. 73-1 at 2 (sealed).

review, which purportedly began at 7:42 a.m. and lasted four hours.[21]  Defendants also state that Howard has the ability to access his medical records under Administrative Regulation 639.  And they provide a copy of the letter that the Deputy Attorney General sent instructing how Howard could inspect defendants' sealed exhibits (ECF No. 65).[22]

Howard has not addressed the defendants' points or evidence.  I note that Howard filed a timely response to defendants' summary-judgment motion 11 days after he filed notice that he did not receive a copy of that motion.[23]  I suspect that the defendants did not address Howard's motion requesting summons and the last known address for Sgt. Sanchez because Magistrate Judge Weksler promptly denied Howard's motion for that relief.[24]  Howard doesn't actually ask for any relief in his notice and, based on this record, he is not entitled to any.  I therefore move on to Howard's evidentiary objection.

## III.    Objection to the defendants' summary-judgment evidence [ECF No. 71]

Howard objects that the declarations of Drs. Sanchez and Vicuna that defendants submit in support of their summary-judgment motion are inadmissible because they must be signed under the penalty of perjury.[25]  I overrule Howard's objections because each doctor signed his respective declaration "under penalty of perjury pursuant to NRS 53.045 . . . ."[26]  28 U.S.C. § 1746(2) provides that an unsworn declaration that is signed and dated by the author and substantially declares "under penalty of perjury that the foregoing is true and correct" is

---

[21] *Id.*

[22] ECF No. 73-2 at 2 (sealed).

[23] ECF No. 74.

[24] ECF No. 34.

[25] ECF No. 71.

[26] ECF No. 63-5 at 41 (Vicuna declaration), 43 (Sanchez declaration).

1  sufficient to satisfy any law or rule that requires a matter to be proved by sworn declaration or

2  affidavit.  Drs. Sanchez and Vicuna's declarations meet § 1746's standard.  And the lack of wet-

3  ink signatures on the declarations does not make them deficient.[27]  I therefore overrule Howard's

4  evidentiary objections.

5  **III.    Motion for investigation [ECF No. 79]**

6          Howard filed a motion asking for an "investigation" into his contention that the prison

7  has been ignoring his grievances that a correctional officer named Cole has been "yelling out in"

8  Howard's housing unit that "Howard is a snitch because of [his] numerous grievances and

9  complaints."[28]  I construe Howard's motion for an investigation as a motion seeking to reopen

10  and enlarge the time for him to amend his pleading to add new claims and parties, and I deny the

11  motion because Howard does demonstrate that his failure to plead these claims and sue these

12  parties is the product of excusable neglect or that good cause exists for him to amend to add

13  them.  Good cause for this proposed amendment does not exist because the alleged bad-

14  mouthing appears to be recent and is not materially connected to any claim at issue in this action,

15  which concerns events that occurred in 2016.  Howard's motion for an investigation is therefore

16  denied.

17  **IV.    Summary-judgment motions [ECF Nos. 58, 62]**

18          Howard moves for summary judgment on nearly all of his claims for relief.  To support

19  his motion, Howard provides copies of his grievance and response records and investigation

20  reports that the NDOC prepared for the Attorney General's office.  Defendants argue that

21  Howard's arguments are unsupported because he largely relies on the grievance and response

22

23  [27] Temporary General Order 2020-05.

   [28] ECF No. 79.

records.  I consider those records in resolving the parties' summary-judgment motions because the grievances themselves substantially comply with 28 U.S.C. § 1746(2)'s requirements: each is signed and dated by Howard and purports to be a "sworn declaration under penalty of perjury."[29] Defendants likewise move for summary judgment on all of Howard's claims.  To support their motion, defendants provide their own declarations, excerpts of Howard's deposition testimony, and Howard's medical records.  I address the parties' arguments about each claim in turn.

### A.      Summary-judgment standard

The principal purpose of the summary-judgment procedure is to isolate and dispose of factually unsupported claims or defenses.[30]  The moving party bears the initial responsibility of presenting the basis for its motion and identifying the portions of the record or affidavits that demonstrate the absence of a genuine issue of material fact.[31]  If the moving party satisfies its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts that show a genuine issue for trial.[32]  "When simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of"—and against—"both motions before ruling on each of them."[33]

---

[29] *See, e.g.*, ECF No. 58 at 30 (informal grievance), 32 (first-level grievance), 34 (second-level grievance), 91 (emergency grievance).

[30] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[31] *Celotex*, 477 U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

[32] Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Auvil v. CBS 60 Minutes,* 67 F.3d 816, 819 (9th Cir. 1995).

[33] *Tulalip Tribes of Washington v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citing *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two,* 249 F.3d 1132, 1134 (9th Cir. 2001)).

1

**B.      Deliberate indifference to serious medical needs**

2      The Eighth Amendment prohibits the imposition of cruel and unusual punishment and

3 "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and

4 decency.'"[34]  A prison official violates the Eighth Amendment when he acts with "deliberate

5 indifference" to the serious medical needs of an inmate.[35]  "To establish an Eighth Amendment

6 violation, a plaintiff must satisfy both an objective standard—that the deprivation was serious

7 enough to constitute cruel and unusual punishment—and a subjective standard—deliberate

8 indifference."[36]

9      To satisfy the first prong, "the plaintiff must show a serious medical need by

10 demonstrating that failure to treat a prisoner's condition could result in further significant injury

11 or the unnecessary and wanton infliction of pain."[37]  To establish the deliberate indifference

12 prong, a plaintiff must show "(a) a purposeful act or failure to respond to a prisoner's pain or

13 possible medical need and (b) harm caused by the indifference."[38]  "Indifference may appear

14 when prison officials deny, delay[,] or intentionally interfere with medical treatment, or it may

15 be shown by the way in which prison physicians provide medical care."[39]  When a prisoner

16

17

18

19

---

20 [34] *Estelle v. Gamble*, 429 U.S. 97, 102 (1976).

21 [35] *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).

[36] *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012).

22 [37] *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotations omitted).

23 [38] *Id.*

[39] *Id.* (internal quotations omitted).

alleges that delay of medical treatment evinces deliberate indifference, the prisoner must show that the delay led to further injury.[40]

### 1.    Count 1

Howard alleges in Count 1 that Lt. Porter and Sgt. Sanchez were deliberately indifferent to his serious medical needs when they failed to properly respond to his emergency grievances on September 25 and 26, 2015, requesting to be seen by medical staff as soon as possible because he had "great pain" in his back and right leg and foot from a nerve injury and "could hardly walk."[41]  This allegedly occurred while Howard was an inmate at HDSP.  Howard alleges that Sgt. Sanchez prolonged his pain because he videotaped, per NDOC policy, the incident of Howard calling a "man down" and being taken to the infirmary on September 26.  Howard alleges that Lt. Porter prolonged his pain when he denied Howard's emergency grievance on September 25.[42]

Porter declares that on September 25 he was employed at HDSP as a correctional sergeant but was not authorized to provide medical care or direct others to do so, and he "responded only to grievances regarding visitation issues of inmates housed at HDSP."[43]  He was not a correctional lieutenant at HDSP or any other institution within NDOC as Howard alleges about the officer who denied his emergency grievance that day.[44]  Porter declares that he was not

---

[40] *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) (holding that "mere delay of surgery, without more, is insufficient to state a claim of deliberate medical indifference").

[41] ECF No. 58 at 10 (emergency grievance dated 9/25/2015); *accord* ECF No. 5 at 8–10 (first amended complaint).

[42] ECF No. 5 at 8–10.

[43] ECF No. 63-1 at 15, ¶¶ 1–2 (Porter declaration).

[44] *Id.* at ¶ 11.

aware of Howard's need for medical attention or his grievance to that effect; moreover, Porter's "name is not affixed to" the grievance.[45]

Howard concedes that this evidence creates a genuine dispute about whether Porter was deliberately indifferent to his serious medical needs.[46] But it does more than that—it merits summary judgment in Porter's favor because Howard's evidence does not refute the specific facts that Porter was not the officer who responded to Howard's emergency grievances and was not aware of Howard's medical needs or grievances. Howard's evidence—the grievance response itself—raises only speculation that Porter is the officer who responded to the grievance. I therefore grant summary judgment in Porter's favor on Count 1.

Defendants correctly point out that there is no evidence that Howard served Sgt. Sanchez with process.[47] Howard sued two defendants with the last name Sanchez—"Dr. Sanchez" and "Sgt. Sanchez." Magistrate Judge Weksler noted in an order granting Howard's motion to issue summonses that the Nevada Attorney General "did not accept service on behalf of 'Sgt. Sanchez'" because that "[d]efendant could not be identified from the information provided by [Howard]."[48] Howard took no further action and ultimately failed to serve either Sanchez defendant with process.[49] The Nevada Attorney General eventually answered the amended complaint on behalf Dr. Sanchez, but not Sgt. Sanchez.[50] Rule 4(m) states that if a defendant is not timely served with process, the court "must dismiss the action without prejudice to that

---

[45] *Id.* at ¶¶ 5–10.

[46] ECF No. 74 at 4–5.

[47] ECF No. 62 at 3, n.1.

[48] ECF No. 30 at 2, n.2.

[49] *See* ECF Nos. 31 (sealed summons), 43 (sealed summons returned unexecuted), 45 (Howard's filing stating service completed on named defendants except Francisco Sanchez).

[50] ECF No. 47.

defendant or order that service be made within a specified time."[51]  This case is four years old and has advanced to the dispositive-motion stage; it is too late to order service on Sgt. Sanchez without causing unnecessary delay.  Sgt. Sanchez is therefore dismissed from the amended complaint without prejudice under Federal Civil Procedure Rule 4(m).

### 2.    Count 2

Howard alleges under Count 2 that defendants Groover, Gutierrez, Drs. Sanchez and Vicuna, Willett, Aranas, Clark, Piscos, Dzurenda, Gentry, and Adams were deliberately indifferent to his serious medical needs because each of them refused to provide him meals in his cell under the Southern Desert Detention Center's (SDCC) blanket policy that a prisoner cannot eat if he cannot walk to the culinary hall.[52]  Howard argues that defendants knew that he had a serious medical need to be fed in his cell because he submitted numerous grievances stating that he was in too much pain to walk to the culinary hall and that taking his pain medication without food would ruin his digestive tract.[53]  Defendants argue, among other things, that Howard's conclusions of deliberate indifference are belied by the evidence and he grossly misstates SDCC's policy about in-cell meal service.[54]  I begin with the extensive factual background for this claim.

### a.    Factual background

Howard was transferred from HDSP to SDCC on December 22, 2015.[55]  When Dr. Sanchez saw him the next day for his medical intake, Howard complained about back pain that

---

[51] Fed. R. Civ. P. 4(m).

[52] ECF No. 5 at 11–13.

[53] ECF No. 58 at 18–20.

[54] ECF No. 62 at 6–19.

[55] ECF No. 65-1 at 1, ¶ 8(a) (sealed).

he experienced after climbing down from his bed.[56]  "Dr. Sanchez prescribed . . . Howard non-steroidal anti-inflammatory drugs (NSAIDs) for pain, a muscle relaxant, and a lower bunk."[57] When Dr. Vicuna saw Howard on January 11, 2016, for his annual physical, Dr. Vicuna submitted a request to the Utilization Review Committee (URC) for a CT scan.[58]  The request was later approved.[59]

Howard filed an emergency grievance at 7:00 a.m. on January 24, 2016, stating: "I have a medical problem I'm unable to walk.  I can't take my medication without eating.  I spoke to the unit officer who call and reported.  They refuse to bring me a meal so I can take my medication. I'm request [sic] hot meal."[60]  Defendant Groover denied this grievance, stating that it does not qualify as an emergency, instructing Howard to file a grievance at the informal level, and noting that Howard was given two sack lunches.[61]  The NDOC's investigation report states that medical and SDCC control were both notified about this grievance.[62]  Howard's medical records reflect that when medical staff responded to this grievance, Howard stated that he could not bear weight on his right foot and was not taking his pain medication because he wanted a hot meal instead of

---

[56] ECF No. 63-5 at 43.

[57] ECF No. 65-1 at 1, ¶ 8(b).

[58] *Id.* at 2, ¶ 8(c).

[59] *Id.*

[60] ECF No. 58 at 23 (grievance #20063015911).

[61] *Id.*

[62] *Id.* at 26.

sack lunches.[63]  Howard "was able to stand up, take steps in the cell without facial grimace, and was able to sit."[64]  Howard was scheduled to see a medical provider the next day.[65]

Howard filed another emergency grievance 11 hours later, stating that he was "unable to walk to chow[,]" had "a nerve injury in [his] back and . . . can't take medication without food."[66] Howard states that he didn't have "a hot meal" that day and if prison officials don't want to feed him, then he's requesting medical help.[67]  Defendant Willett denied this grievance, stating that, "per medical[,]" Howard does not have a lay-in order authorizing him to be fed in his cell.[68] Howard's medical records state that an SDCC nurse responded to this grievance by taking "pretzels, corn chips, and crackers to [Howard's] cell to take with his medication[ ] but Howard declined the food."[69]

Howard submitted another emergency grievance 2 hours later, stating that the "nurse responded to [his] emergency grievance" at about "7:00 p.m." and told him "that she was going to get some food so [Howard] can take [his] medication, which [he] wasn't given no food."[70] "Now I have been inform[ed] by the unit officer that [the nurse] said I'm O.K. without food or medication I['m] still in pain with no food."[71]  Defendant Willett denied this grievance, stating that he contacted the infirmary and confirmed that Howard could walk there for his medication

---

[63] ECF No. 65-1 at 2, ¶ 8(d) (sealed).

[64] *Id.*

[65] *Id.*

[66] ECF No. 58 at 24 (grievance #20063015819).

[67] *Id.*

[68] *Id.*

[69] ECF No. 65-1 at 2, ¶ 8(e) (sealed).

[70] ECF No. 58 at 25 (grievance #20063015818).

[71] *Id.*

and that the culinary hall was closed.[72]   NDOC's investigation report states that medical was

contacted about Howard's grievance and confirmed that he did not have a "lay-in" and was

scheduled to see a medical provider the next day.[73]

Howard's medical records state that Howard failed to show for his appointment with the

medical provider on January 25, 2016.[74]   Howard filed an informal grievance that day

complaining that he had pain from a nerve and back injury and needed to take his pain

medication with food but SDCC's policy doesn't allow him to eat because he cannot always

walk to the culinary hall, and stating that the policy was the reason why the officer refused to

give Howard food in his cell to take his medication.[75]   Howard sought a "medical operation so

[he could] walk."[76]   Adams denied this grievance at the informal level, stating that he spoke to

SDCC infirmary nurse Carrillo who advised "that if an inmate is medically unable to have his

meals at the culinary, a Provider's order will be obtained for the inmate to be transferred to the

HDSP infirmary."[77]   Adams concluded that Howard needed to follow up with the infirmary staff

by submitting a medical kite."[78]   Howard's appeal of this denial was twice rejected for improper

procedures.[79]   So Howard did not exhaust his administrative procedures for this grievance.

Howard submitted an emergency grievance at 9:00 a.m. on January 26, 2016, stating that

he had been complaining "since January 23rd" that he needed a meal because of his inability to

---

[72] *Id.*

[73] *Id.* at 26.

[74] ECF No. 65-1 at 2, ¶ 8(f) (sealed).

[75] ECF No. 63-5 at 13 (grievance #20063016007).

[76] *Id.*

[77] *Id.* at 12.

[78] *Id.*

[79] *Id.* at 14–15.

14

walk, was taking medication to help him walk, and needed to eat before doing so.  Howard requested medical assistance.[80]  Defendant Groover denied this grievance, stating that Howard's complaint was not an emergency and instructing Howard to refile his grievance at the informal level.[81]  Howard's medical records state that when medical staff responded to this grievance "at approximately 10:20 a.m.," Howard "complained [that] he had not eaten in three days and could not walk to SDCC Culinary."[82]  But "the responding medical staff noted [that] [Howard] was able to bear weight on his right leg without any apparent discomfort and was ambulatory with a limp."[83]

Howard filed an informal grievance on May 26, 2016, complaining that he was experiencing pain from a nerve and back injury and needed to take his pain medication with food but SDCC's policy doesn't allow him to eat because he cannot always walk to the culinary hall and states that he could not do so on at least nine days in January, March, and April 2016.[84] Defendant Clark denied this grievance at the informal level, stating that Howard's medical chart reflected that "he had been given crutches to assist with ambulation" but had been observed "holding instead of using them to walk" and had an appointment with the medical provider on August 8 to discuss the results of his MRI but "did not mention any problems regarding ambulation."[85]  Clark concluded that if Howard felt that he "cannot walk on this yard and need[s]

---

[80] ECF No. 58 at 27.

[81] Id.

[82] ECF No. 65-1 at 2, ¶ 8(g) (sealed).

[83] Id.

[84] ECF No. 58 at 30 (grievance #20063027319).

[85] ECF No. 63-4 at 43.

to be in a room where [he] is served [his] food[,] then [to] write a kite to discuss [his] concerns with the provider."[86]

Howard appealed, stating that it was not his first complaint about not being able to walk and going unfed and that all his medication clearly states that he is to take it with food.[87] Gutierrez denied this grievance at the first level, stating a review of Howard's medical chart showed that he was a no-show for appointments, had been observed carrying his crutches rather than using them, had been offered food to take into his cell to take his medication, and had been seen by the provider and an orthopedic specialist.[88]  Gutierrez concluded that Howard needed to submit a kite for medical staff to address his needs.[89]

Howard appealed, stating he "didn't receive crutches until months later and somedays with crutches [I] still can't walk because of the pain."[90]  Aranas denied this grievance at the second level, stating that he reviewed Howard's "medical records and saw that all the orders given by [the] Provider were carried out appropriately on a timely manner.  [Howard] was seen and reported not even using [his] crutches.  [Howard's] crutches were ordered for a reason to help [him] ambulate and were issued as soon as it was ordered."[91]

Howard's medical records state that when he was seen by an NDOC medical provider on January 27, 2016, he was issued crutches, administered a shot of "Toradol (pain medication),"

---

[86] *Id.*

[87] *Id.* at 49.

[88] *Id.* at 48.

[89] *Id.*

[90] *Id.* at 51.

[91] *Id.* at 50.

and provided Tylenol.[92]  There is no record that Howard complained to the provider about being unable to walk to the culinary hall.[93]  Howard saw an NDOC medical provider on January 30, 2016, and was provided a shot of Prednisone (anti-inflammatory) for his back.[94]  In February and March 2016, Howard received various medications for pain: Flexeril, Tylenol, ibuprofen, Prednisone.[95]  Howard was observed "in the SDCC culinary hall without his crutches and dancing" on February 12, 2016; ambulating at "a fast pace, without crutches, and with no facial grimace or balance problems" six days later; and during a "nurse encounter" on March 7, 2016, "was observed ambulatory and holding crutches instead of using" them.[96]

Howard received a CT scan on March 30, 2016.[97]  Dr. Vicuna submitted an orthopedic consultation request to the URC on April 1, 2016.[98]  At the end of that month, Howard saw an outside orthopedic specialist, Dr. Richard Wullf, who recommended an MRI and a follow-up visit, and ordered Howard to receive Naproxen.[99]  Howard received the Naproxen on May 11, 2016, and had an MRI on July 28, 2016.[100]  Comparing the results to Howard's CT scan, the MRI report noted that there was "'no appreciable interval change in middle multilevel degeneration of the lumbar spine' and 'mild' neuroforaminal stenosis . . . from L2-L5."[101]

---

[92] *Id.* at ¶ 8(h).

[93] *Id.*

[94] *Id.* at ¶ 8(i).

[95] *Id.* at ¶¶ 8(k)–(t).

[96] *Id.* at ¶¶ 8(m), (n), (q).

[97] *Id.* at ¶ 8(g).

[98] *Id.* at ¶ 8(s).

[99] *Id.* at ¶ 8(w).

[100] *Id.* at 3–4, ¶¶ 8(x), (cc).

[101] *Id.* at 4, ¶ 8(cc).

Howard received an X-ray and saw Dr. Wullf on September 12, 2016, where Howard presented as being "ambulatory with normal gait."[102]  Dr. Wullf recommended that Howard continue using Naproxen "and follow-up as needed."[103]  Howard received Naproxen on October 13, 2016, and failed to show for his medical appointment on October 26.[104]  When Howard had his annual exam on March 13, 2017, Dr. Vicuna ordered Howard a cane and Tylenol.[105]

Howard testified in deposition that he filed grievances complaining about the lack of a meal only on the days when he couldn't walk.[106]  But on days when he could walk, he'd go "to the culinary," "to the law library," or "to the chapel."[107]  Howard reiterated that it was only on days that he couldn't walk "for whatever reason, [he] ran out of medication or the medication didn't work, those w[ere] the days [that he] wrote and complained about."[108]

### b.    Analysis

Defendants provide evidence that prisoners who are injured or have a medical emergency can receive a "lay-in" order from an NDOC medical provider permitting them to temporarily receive meals in their cell, which are typically moved to the infirmary.[109]  Most defendants declare that they were not trained or authorized to provide prisoners meals in their cells or direct

---

[102] ECF No. 65-1 at 4, ¶ 8 (hh).

[103] Id.

[104] Id. at ¶¶ 8(ii)–(jj).

[105] Id. at ¶ 8 (kk).

[106] ECF No. 63-1 at 36.

[107] Id.

[108] Id.

[109] See, e.g., ECF No. 63-1 at 42–43, ¶¶ 22, 24 (declaration of SDCC Warden Jo Gentry).

others to do so.[110]  As medical providers, Drs. Sanchez and Vicuna could have issued an order for Howard to be fed in his cell, but each declares that Howard never complained about gastrointestinal issues from taking medication without food or being unable to walk to the culinary hall for meals.[111]  Howard did not ask either doctor to transfer him to a medical facility or issue a lay-in order so he could be fed in his cell.[112]  Neither doctor was aware of Howard's grievances or kites on this issue because they didn't respond to any of them.[113]  Several other defendants declare that they, too, did not respond to any of Howard's kites or grievances about his inability to walk to the culinary hall or his need for a lay-in order to be fed in his cell.[114] Howard does not dispute this evidence.

The remaining defendants argue that in responding to Howard's grievances on this issue, they deferred to Howard's medical records and medical staff who confirmed that Howard did not have an order from an NDOC medical provider allowing him to be fed in his cell.[115]  Howard does not provide evidence to the contrary.  Notably, Howard does not dispute that medical staff responded to his emergency grievances.  He does not dispute their assessments.  And he doesn't dispute defendants' assertion that SDCC's policy required Howard to seek an order from a medical provider to be fed in his cell if he could not walk to the culinary hall for meals.

---

[110] ECF Nos. 63-5 at 1, ¶ 17 (Groover declaration); 63-6 at 4, ¶¶ 8–9 (Willett declaration); 63-4 at ¶ 7 (Gutierrez declaration); 63-4 at 54–55 (Piscos declaration); 63-5 at 33, ¶ 18 (Dzurenda declaration); 63-1 at 43, ¶ 23 (Gentry declaration); 63-5 at 38, ¶ 19 (Adams declaration).

[111] ECF Nos. 63-5 at 43, ¶ 12, 14 (Sanchez declaration); 63-5 at 41, ¶ 14–15 (Vicuna declaration).

[112] ECF Nos. 63-5 at 43, ¶ 13 (Sanchez declaration); 63-5 at 41, ¶ 14 (Vicuna declaration).

[113] ECF Nos. 63-5 at 43, ¶ 15 (Sanchez declaration); 63-5 at 41, ¶ 16 (Vicuna declaration).

[114] ECF Nos. 63-5 at 54 (Piscos declaration); 63-5 at 33, ¶ 21 (Dzurenda declaration); 63-1 at 43, ¶¶ 25–26 (Gentry declaration).

[115] *See, e.g.*, ECF Nos. 63-5 at 39, ¶ 21 (Adams declaration); 63-4 at 57, ¶ 15 (Gutierrez declaration); 63-4 at 58–59, ¶ 10 (Aranas declaration).

1    Howard's own evidence, in fact, shows that he was repeatedly told that if he could not walk to

2    the culinary hall to receive his meals, then he needed to ask a medical provider for an order to be

3    fed in his cell and to file a medical kite to start that process.[116]

4         "The blanket, categorical denial" of medical treatment "solely on the basis of an

5    administrative policy . . . is the paradigm of deliberate indifference."[117]  But it is undisputed that

6    under SDCC's policy, Howard could be fed in his cell if an NDOC medical provider issued an

7    order providing him that accommodation.  Also undisputed is the fact that, during the time

8    relevant to this claim, Howard did not ask a medical provider to issue him an order to be fed in

9    his cell despite having numerous opportunities to do so.  So Howard has failed to raise a factual

10   dispute for trial that he went unfed on January 24–26 because SDCC had a blanket policy that a

11   prisoner would not be fed unless he could walk to the culinary hall for meals.

12        Howard also fails to raise a triable issue that Drs. Sanchez or Vicuna, Piscos, Dzurenda,

13   or Gentry personally participated in the alleged constitutional violation.  This is fatal to

14   Howard's claim against them because a defendant is liable under 42 U.S.C. § 1983 "only upon a

15   showing of personal participation by the defendant."[118]  "A supervisor is only liable for

16   constitutional violations of his subordinates if the supervisor participated in or directed the

17   violations, or knew of the violations and failed to act to prevent them.  There is no respondeat

18   superior liability under [§]1983."[119]

19   _____

20   [116] ECF Nos. 58 at 21(01/27/2016 response to grievance # 20063016007 at informal level), 31
     (07/01/2016 response to grievance # 20063027319 at the informal level), 95 (06/06/2016 NDOC
     investigation report); 63-43 at 43.

21   [117] *Colwell v. Bannister*, 763 F.3d 1060, 1063 (9th Cir. 2014).

22   [118] *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

23   [119] *Id*.; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (holding that "[b]ecause vicarious
     liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-
     official defendant, through the official's own individual actions, has violated the Constitution").

1    The undisputed evidence shows that in denying Howard's grievances, Groover,

2  Gutierrez, Willett, Aranas, Clark, and Adams deferred to Howard's medical providers'

3  assessments, which did not include a lay-in order for Howard to be fed in his cell.  They also

4  deferred to the assessments of the medical staff members who responded to Howard's

5  emergency grievances the day he made them.  A reasonable jury could not conclude on this

6  evidence that Groover, Gutierrez, Willett, Aranas, Clark, or Adams acted with deliberate

7  indifference when they denied Howard's grievances after confirming with medical staff that he

8  was not medically authorized to be fed in his cell.[120]

9    In sum, Howard has not demonstrated that he is entitled to summary judgment on Count

10  2 under any legal theory.  Nor has he raised a triable issue of fact about any legal theory for

11  liability that he raises under Count 2.  I therefore grant summary judgment in favor of Groover,

12  Gutierrez, Drs. Sanchez and Vicuna, Willett, Aranas, Clark, Piscos, Dzurenda, Gentry, and

13  Adams on the part of Count 2 alleging that they were deliberately indifferent to Howard's

14  serious medical needs.

15      ***3.      Count 4***

16    Howard alleges under Count 4 that Mesa, Groover, and Willett were deliberately

17  indifferent to his serious medical needs on June 7, 2016, when they forced him to move his

18  property and walk distances despite knowing that he had a severe back and leg injury that

19  required him to use crutches.[121]  Howard argues that he attempted to comply with defendants'

20  orders because they threatened him with "going to the hold," but he reinjured his back in the

21

---

22  [120] *See Peralta v. Dillard*, 744 F.3d 1076, 1086 (9th Cir. 2014) (holding that it was not deliberate indifference for grievance responder to defer to a medical provider's assessment of the plaintiff's

23  medical needs).

[121] ECF No. 5 at 16–17.

process.[122]  When Mesa, Groover, and Willett ordered Howard to move his property to a new cell, they deferred to medical staff who confirmed that Howard did not have any medical restrictions preventing him from moving.[123]

The record shows that Howard's need to use crutches and not to lift heavy objects was unpredictable and sporadic; he did not have any restrictions ordered by medical staff on June 7. Howard fails to raise a triable issue of fact about whether Mesa or Groover acted with deliberate indifference when they ordered Howard to move cells.[124]  Howard also has not raised a factual dispute that Willett acted with deliberate indifference when he video recorded, per SDCC policy, Howard being taken to medical for evaluation when Howard claimed, after being put in restraints for failing to comply with Mesa's order to move cells, that he had back pain.  I therefore grant summary judgment in favor of Mesa, Groover, and Willett on the part of Count 4 alleging that they were deliberately indifferent to Howard's serious medical needs.

### 4.    Count 5

Howard alleges under Count 5 that Groover was deliberately indifferent to his serious medical needs when, on July 13, 2016, he forced Howard to walk 150 yards to culinary to hand-deliver an emergency grievance to Groover while on crutches, knowing that the travel would be painful, and in retaliation for the multiple grievances and a civil lawsuit that Howard filed against Groover.[125]  Howard provides a grievance that he submitted as evidence of his version of events.[126]  Groover disputes Howard's account, declaring that when he "was stationed outside of

---

[122] ECF No. 58 at 82.

[123] *See, e.g.*, ECF No. 63-6 at 19–21, ¶¶ 7–23 (Mesa declaration).

[124] *See Peralta*, 744 F.3d at 1086.

[125] ECF No. 5 at 18.

[126] ECF No. 58 at 97.

1  the SDCC culinary supervising the transfer of inmates from their cells to the SDCC culinary for

2  dinner," "Howard approached [him from Howard's housing unit] without using crutches [and]

3  with an emergency grievance."[127]  Groover later learned that the grievance "asserted that

4  [Groover] was retaliating against . . . [Howard] for him not using his crutches."[128]  When

5  "Howard got within a few feet from [Groover], he informed [Groover] that he was having leg

6  and back pain and could not make it back to his housing unit."[129]  "Howard also stated [that] he

7  needed emergency medical attention[,]" so Groover "stayed on scene until medical staff

8  arrived."[130]

9      It is genuinely disputed whether Groover ordered Howard to hand-deliver the emergency

10  grievance to him, or if Howard did that of his own volition or at the instruction of the unnamed

11  "unit officer" who called in the grievance.  The record does not reflect what knowledge Groover

12  had, if any, about whether Howard had any medical restrictions on July 13.  A reasonable jury

13  could conclude that if Groover ordered Howard to unnecessarily walk 150 yards to hand-deliver

14  an emergency grievance to Groover, that Groover was deliberately indifferent to Howard's

15  serious medical needs.  The part of Count 5 alleging deliberate indifference to serious medical

16  needs against Groover can proceed to trial.

17      **C.    First Amendment retaliation**

18      Prisoners have a First Amendment right to file prison grievances and to pursue civil

19  rights litigation in the courts.[131]  "Without those bedrock constitutional guarantees, inmates

20

---

21  [127] ECF No. 63-6 at 3, ¶ 32.

   [128] *Id.* at ¶ 33.

22  [129] *Id.* at ¶ 36.

   [130] *Id.*

23  [131] *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2004).

would be left with no viable mechanism to remedy prison injustices. And because purely retaliatory actions taken against a prisoner for having exercised those rights necessarily undermine those protections, such actions violate the Constitution quite apart from any underlying misconduct they are designed to shield."[132]

To prevail on a First Amendment retaliation claim in the prison context, a plaintiff must establish: "(1) [a]n assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."[133] Total chilling is not required; it is enough if an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities.[134]

### 1.    Count 2

Howard asserts a First Amendment retaliation claim against Willett and Groover under Count 2, alleging that they denied him meals because of his grievances and litigation against them. Defendants argue that the retaliation part of Count 2 fails along with the deliberate-indifference part of Count 2 because SDCC did not have a policy that a prisoner would not be fed if he couldn't walk to the culinary hall and they deferred to the medical provider's assessment that Howard did not have a lay-in order to be fed in his cell.[135] But Howard's retaliation claim is slightly different than his one for deliberate indifference. For the retaliation part of Count 2, Howard focuses on the two sack meals that he contends Groover admitted that he could provide when he responded to Howard's grievance on January 24, 2016. According to

---

[132] *Id.*

[133] *Id.* at 567–68.

[134] *Id.* at 568–69.

[135] *See, e.g.*, ECF No. 62 at n.2 & n.3.

24

Howard, Groover retaliated against him for filing the January 24 emergency grievance by not providing Howard with a sack meal on that day and when Howard filed another emergency grievance on January 26.[136] Howard argues that Willett denied his second emergency grievance on January 24 without providing him a sack meal and this was done in retaliation for Howard's claims against Willett in "Case No. 2:13-cv-01368-RFB."[137]

Howard has raised a triable issue of fact that he was not provided sack meals on January 24 and 26. To prevail on the next element—causation—Howard "must show that his protected conduct" of filing grievances and a lawsuit were "the substantial or motivating factor[s] behind the defendant[s'] conduct."[138] To do so, Howard "need only 'put forth evidence of retaliatory motive, that, taken in the light most favorable to him, presents a genuine issue of material fact as to [the defendant's]' intent in the challenged conduct."[139] The Ninth Circuit illustrated in *Bruce v. Ylst* the kinds of evidence that a plaintiff can provide to meet this burden.

In *Bruce*, the inmate Bruce claimed that prison officials labeled him as a prison-gang affiliate in retaliation for the "jailhouse lawyering" services that he provided.[140] To show that the prison officials had an improper motive for labeling him a gang affiliate, Bruce provided his own declaration describing a conversation that he had with a prison official.[141] According to Bruce, the official said that prison "higher-ups" were "pissed off" about when Bruce "acted as spokesperson for other prisoners' complaints" and ordered subordinates to "validate" Bruce as a

---

[136] ECF No. 58 at 5–6.

[137] *Id.*

[138] *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (internal quotation omitted).

[139] *Id.* (quoting *Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003)).

[140] *Bruce*, 351 F.3d at 1286.

[141] *Id.* at 1288–89.

gang affiliate "to discourage similar complaints and protests."[142]  The Ninth Circuit concluded that "[t]hese statements combined with the suspect timing of the investigation and the fact that stale evidence was used, certainly raise a triable issue of fact regarding whether the motive behind the validation was retaliatory."[143]

Unlike in *Bruce*, Howard doesn't offer statements that Groover, Willett, or any other prison official made about why he was not provided sack meals on January 24 and 26.  His only evidence is timing.  "True, timing can properly be considered as circumstantial evidence of retaliatory intent."[144]  But "there is little else to support the inference" here.[145]  For instance, there is no evidence that Groover or Willett had authority to authorize Howard to receive sack meals on either day.  Groover declares that he deemed Howard's first emergency grievance on January 24 not an actual emergency "based upon information provided to [him] that correctional staff was in the process of delivering two (2) sack lunches to . . . Howard's cell."[146]  The undisputed evidence shows that in responding Howard's emergency grievances, Groover and Willett relied on assessments from SDCC's medical staff that Howard did not have an order permitting him to be fed in his cell.  It is sheer speculation that Howard did not receive sack meals on January 24 and 26 because Groover and Willett did not provide them in retaliation for Howard filing grievances and litigation.  Thus, the portion of Count 2 alleging First Amendment retaliation against Willett and Groover falters at the second element.  I therefore grant summary judgment in favor of Willett and Groover on the retaliation part of Count 2.

---

[142] *Id.* at 1298.

[143] *Id.*

[144] *C.f. Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995).

[145] *See id.*

[146] ECF No. 63-6 at 1, ¶ 13.

1          **2.     *Count 5***

2         Howard asserts a First Amendment retaliation claim against Groover under Count 5,

3   alleging that on July 13, 2016, Groover forced Howard to walk 150 yards to culinary knowing

4   that the travel would be painful to Howard and in retaliation for the multiple grievances and the

5   civil lawsuit that Howard filed against Groover.  Howard provides his grievances to support his

6   version of what happened: he filed an emergency grievance against Groover because he was told

7   by correctional officer "Bert" that Howard was to be written up if he was observed walking

8   without using his crutches. [147]  Howard later learned that it was Groover who issued the

9   instruction to hand-deliver the emergency grievance to the culinary hall.[148]  But, before that

10  happened, he filed an emergency grievance about unknown staff members retaliating against him

11  for filing grievances by writing him up for not always using his crutches to walk.[149]

12        It is pure speculation whether Groover retaliated against Howard because of any litigation

13  that Howard had filed.  But Howard has identified sufficient evidence to raise a triable issue of

14  fact that Groover ordered him to hand-deliver the emergency grievance to the culinary hall

15  because Groover was annoyed with Howard's many grievances and wanted to deter Howard

16  from filing more.  A reasonable jury could find that causing a prisoner to suffer pain by making

17  him go out of his way on crutches to file an emergency grievance is enough to chill a person of

18  ordinary firmness from filing grievances in the future and does not serve a legitimate correctional

19  goal.[150]  Thus, the part of Count 5 alleging a claim of First Amendment retaliation against

20  _____

21  [147] ECF No. 58 at 94.

    [148] *Id*. at 97.

22  [149] *Id*. at 94.

23  [150] *See Brodheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009) (internal quotation omitted) (noting
    that the mere "threat of retaliation is sufficient injury if made in retaliation for an inmate's use of
    prison grievances procedures").

1  Groover for the incident on July 13, 2016, raises a genuine issue of material fact and can proceed

2  to trial.

3      **D.    First Amendment free exercise of religion**

4      The First Amendment to the United States Constitution provides that "Congress shall

5  make no law respecting the establishment of religion, or prohibiting the free exercise thereof."[151]

6  The United States Supreme Court has held that inmates retain protections afforded by the First

7  Amendment "including its directive that no law shall prohibit the free exercise of religion."[152]

8  "In general, a plaintiff will have stated a free exercise claim if: (1) 'the claimant's proffered

9  belief [is] sincerely held; and (2) 'the claim [is] rooted in religious belief, not in purely secular

10 philosophical concerns.'"[153]  The Supreme Court has recognized that an inmate's "limitations on

11 the exercise of constitutional rights arise both from the fact of incarceration and from valid

12 penological objectives—including deterrence of crime, rehabilitation of prisoners, and

13 institutional security."[154]  "A person asserting a free exercise claim must show that the

14 government action in question substantially burdens the person's practice of [his] religion."[155]

15     During summary judgment, courts evaluate prison regulations alleged to infringe on

16 constitutional rights under the "reasonableness" test set forth by the Supreme Court in *Turner v.*

17 *Safley*.[156]  The first *Turner* factor requires the proponent of the prison regulation to demonstrate

18

---

19 [151] U.S. Const. amend. I.

20 [152] *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987).

   [153] *Walker v. Beard*, 789 F.3d 1125, 1138 (9th Cir. 2015).

21 [154] *O'Lone*, 482 U.S. at 349.

22 [155] *Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015).

23 [156] *Turner v. Safley*, 482 U.S. 78, 89–91 (1987); *O'Lone*, 482 U.S. at 349; *see Hrdlicka v. Reniff*, 631 F.3d 1044, 1046–50 (9th Cir. 2011) (analyzing the *Turner* factors applied during summary judgment on appeal).

1  that there is "a valid, rational connection between the prison regulation and the legitimate

2  governmental interest put forward to justify it."[157]  The second *Turner* factor requires the

3  proponent to demonstrate that there are "alternative means of exercising the right that remain

4  open to prison inmates."[158]  When considering this factor, *Turner* instructs that "courts should be

5  particularly conscious of the measure of judicial deference owed to correctional officials . . . in

6  gauging the validity of the regulation."[159]  "The third consideration is the impact [that]

7  accommodation of the asserted constitutional right will have on guards and other inmates, and

8  the allocation of prison resources generally."[160]  And the final factor instructs that the absence of

9  "ready alternatives" to a particular prison regulation is evidence that it is reasonable and not "an

10  exaggerated response to prison concerns."[161]

11          ***1.     Count 3***

12         Howard asserts a First Amendment free-exercise-of-religion claim against Cox,

13  Dzurenda, Gentry, Adams, and Tristan under Count 3 based on their alleged adoption and

14  implementation of a policy at SDCC to close the chapel if the resident chaplain is not on site and

15  there is not an outside volunteer to conduct services.[162]  Howard alleges that this policy burdens

16  his exercise of the Islamic faith because it limits Friday congregational prayer, which he

17  contends is a tenant of his faith, to once a month because the chaplain doesn't work Friday and

18

19

20  [157] *Turner*, 482 U.S. at 89 (internal quotation omitted).

21  [158] *Id.* at 90.

22  [159] *Id.* (internal quotation omitted).
  [160] *Id.*

23  [161] *Id.*
  [162] ECF No. 5 at 14–15.

1  the volunteer serves all of the prisons in Nevada.[163]  Howard filed several grievances stating that

2  he was not able to access the chapel for prayer services on several days in 2016 for this reason.[164]

3         Tristan responded to four of Howard's grievances at the second level, explaining that "the

4  AR 810 manual states that inmates are permitted to practice a recognized religion to which they

5  ascribe within the limitations imposed by individual structures, staffing levels, other

6  considerations of security, good order and discipline, consistent with consideration of costs and

7  limited resources."[165]  Tristan stated that Howard's grievances were properly denied under AR

8  810 because there was no chaplain or volunteer to supervise services on the dates at issue.

9  Tristin concluded by telling Howard this his "remedy to have a custody officer supervise the

10 services is not feasible at this time" because "custody staffing levels are determined by the

11 Nevada Legislature, and currently the staffing levels as [sic] SDCC cannot support chapel

12 coverage without generating overtime expenses."[166]  Both sides move for summary judgment on

13 this claim.[167]

14        Howard bears the burden of showing that his religious belief is sincerely held and his

15 claim is rooted in religious beliefs, not secular ones.  Howard states that he is a practicing

16 Muslim of the Nation of Islam, and nothing in the record belies this claim.[168]  He insists that

17

18

19

20 [163] *Id.*

21 [164] ECF No. 58 at 61–81.

   [165] ECF Nos. 63-5 at 36, ¶ 18–20 (Tristan declaration); 58 at 65, 73.

22 [166] ECF No. 58 at 65.

23 [167] ECF Nos. 62 at 19–23, 58 at 57–82.

   [168] *See, e.g.*, ECF No. 58 at 78.

attending congregational or group prayer services on Friday is a tenant of his faith.[169]  Howard has met his burden for both showings.

Addressing the *Turner* factors, defendants explain in their declarations that SDCC adopted AR 810's provision prohibiting inmates from accessing the chapel when neither the chaplain nor a religious volunteer is on site due "the security and safety concerns of that institution."[170]  They explain that "allowing inmates to congregate at an institutional chapel without non-inmate supervision created safety and security risks[,]" including "gang activity[;] making an'or distributing weapons, alcohol, illicit substances, and other contraband[;] orchestrating and/or effectuating violence upon other inmates or staff[;] [or] coordinating efforts to disrupt prison operations or escape."[171]  The Ninth Circuit recognized in *Jones v. Bradley* that Washington State defendants have "a legitimate interest in maintaining the chapel as a place of refuge, free from custodial supervision, in their efforts to rehabilitate inmates."[172]  The *Jones* court also recognized that "[a]ppropriate restrictions on chapel use, including requiring the presence of an outside sponsor for chapel meetings, are reasonable to maintain order and security."[173]  Nearly two decades later in *Anderson v. Angelone*, the Ninth Circuit considered whether the NDOC's policy of prohibiting inmates from leading religious groups violated an inmate's First Amendment right to the free exercise of religion.[174]  The district court found that the regulation satisfied the *Turner* factors, and the Ninth Circuit affirmed, explaining that

---

[169] ECF No. 58 at 60.

[170] *See, e.g.*, ECF No. 63-5 at 35, ¶ 14.

[171] *Id.* at ¶ 15; *accord* ECF Nos. 63-5 at 30, ¶ 14; 63-5 at 33, ¶ 14; 63-1 at 42, ¶ 16.

[172] *Jones v. Bradley*, 590 F.2d 294, 296 (9th Cir. 1979).

[173] *Id.*

[174] *Anderson v. Angelone*, 123 F.3d 1197, 1198–99 (9th Cir. 1997).

1    "[r]equiring an outside minister to lead religious activity among inmates undoubtedly contributes

2    to prison security.  It helps ensure that inmate activity is supervised by responsible individuals

3    and lessens the possibility that inmate religious groups will subvert prison authority."[175]  The

4    appellate court concluded that the regulation did not foreclose the inmate from practicing his

5    religion; "in fact, he is welcome to assist the prison chaplain in leading religious activities."[176]

6    So "there are other ways for [the inmate] to exercise his rights."[177]  "But in light of the prison's

7    security concerns," the court "did not see any ready alternatives to the regulation."[178]

8         Like in *Jones* and *Anderson*, defendants have demonstrated that AR 810's provision

9    prohibiting inmates from using the chapel when neither the chaplain nor an approved volunteer is

10   on site is validly and rationally connected to the legitimate interest in maintaining the security of

11   the prison and the safety of its prisoners and staff.  Defendants have demonstrated that

12   accommodating a right to use the chapel in the absence of a non-inmate religious supervisor

13   could have negative ripple effects like prisoner-preachers undermining prison authority and in-

14   fighting.  Defendants identify alternative means that Howard has to exercise his religion,

15   including the group-prayer aspect that he sues about.  Howard was able to attend Friday services

16   when the chaplain or volunteer was present.  Howard does not allege that Friday services were

17   never available to him; rather, he admits that Friday services occurred "maybe once a month."[179]

18   He was able to attend 30 days of Ramadan services.[180]  He had access to the chapel on Tuesdays

19

20   _____

     [175] *Id.* at 1199.

21   [176] *Id.*

     [177] *Id.*

22   [178] *Id.*

23   [179] ECF Nos. 63-1 at 18, 58 at 58.

     [180] ECF No. 63-1 at 23.

when Muslim inmates had the chapel for studying and lectures.[181]  And he was permitted to pray in his cell.[182]

There is still a dearth of "ready alternatives" to simply closing the chapel to inmates when there is no chaplain or approved volunteer on site.  As the Ninth Circuit pointed out in *Jones*, having correctional staff supervise religious services takes away from the sanctuary aspect that the chapel is intended to provide.  And it leaves unresolved the legitimate concerns that prison officials have about prisoner-led religious services leading toward prisoners undermining prison authority.  I therefore grant summary judgment in favor of Cox, Dzurenda, Gentry, Adams, and Tristan on Count 3.

### E.  Excessive force

When a prison official stands accused of using excessive physical force in violation of the cruel-and-unusual punishment clause of the Eighth Amendment, the question turns on whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically for the purpose of causing harm.[183]  In determining whether the use of force was wanton and unnecessary, it may also be proper to consider factors such as the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response.[184]  Although an inmate need not have suffered serious injury to bring an excessive-force claim against a prison official, the Eighth Amendment's prohibition against

---

[181] *Id.* at 17.

[182] *Id.* at 22.

[183] *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992).

[184] *Id.* at 7.

1    cruel-and-unusual punishments necessarily excludes from constitutional recognition de minimis

2    uses of physical force.[185]

3                    *1.     Count 4*

4            Howard asserts an excessive-force claim against Mesa under Count 4 for unnecessarily

5    handcuffing Howard after he'd fallen during the cell-moving incident on June 7, 2016.[186]

6    Howard recounts that Mesa told him that per Groover's instruction, if Howard did not move his

7    properties to his new cell, that he would be put in "the hole."[187]   Howard told Mesa that he had a

8    medical condition and could not lift heavy items.[188]   Howard submitted an emergency grievance

9    to no avail, so he "attempt[ed] to move a box and reinjured his back."[189]   At that point Howard

10   requested a "man-down" emergency response and was handcuffed by Mesa, who placed him in a

11   holding room until Willett arrived with a video camera to record him being transported to the

12   medical department.[190]

13           Mesa provides a slightly different account of what happened.  He claims that when he

14   told Howard that he had to move his property to a new cell, Howard said he couldn't because his

15   items were too heavy.[191]   Mesa told Howard that he could request that a friend help him move, at

16   which point Howard became "very upset and requested an emergency grievance" and walked

17   away.[192]   "A few minutes later," "Howard  returned on crutches and handed [Mesa] an

18   _____

19   [185] *Id.* at 9–10.

     [186] ECF No. 5 at 16–17.

20   [187] ECF No. 58 at 82; *accord id.* at 84–92.

21   [188] *Id.*

     [189] *Id.*

22   [190] *Id.*

23   [191] ECF No. 63-3 at 20, ¶ 11.

     [192] *Id.* at ¶ 13.

emergency grievance [that] was processed."[193]   Mesa told Howard that he was "still expected to

move unless he had a physician's order or lay-in that prevented him from moving, at which point

he requested a man-down because he was in pain."[194]   Mesa explains that a man-down "is an

inmate request for immediate medical attention."[195]   Mesa informed the shift-command officers

of the man-down and was instructed by Groover "to contact SDCC medical staff to inform them

of the man-down and confirm whether" "Howard had a medical restriction."[196]   Mesa did and

"SDCC medical confirmed [that Howard] did not require immediate medical attention" as "he

had no medical restriction or lay-in that prevented him from moving cells[;]" Howard "needed to

put in a medical kite."[197]   Mesa relayed this information to Groover and gave Howard another

opportunity to comply with the order to move his property.[198]   Howard refused, so Mesa "placed

[him] in mechanical restraints" because he was failing to comply with [Mesa's] direct order and

was causing a disruption of the scheduled move."[199]

        Defendants argue that Mesa's use of the mechanical restraints was not excessive as a

matter of law because he did so "after Howard became upset about moving cells, after Howard

refused to obey Mesa's lawful orders to move cells, and after Mesa confirmed with SDCC

medical staff [that] Howard had no medical restrictions that prevented him from moving

cells."[200]   More importantly, although Howard claims that he injured his back trying to lift a box

---

[193] *Id.* at ¶ 14.

[194] *Id.* at ¶ 15.

[195] *Id.* at ¶ 16.

[196] *Id.* at ¶ 17.

[197] *Id.* at ¶ 18.

[198] *Id.* at ¶¶ 19–20.

[199] *Id.* at ¶ 21.

[200] ECF No. 62 at 27.

to comply with Mesa's order, Howard does not genuinely dispute that Mesa applied the

mechanical restraints after SDCC medical staff told Mesa that Howard's situation did not require

immediate medical attention.[201]  There is no evidence of the extent of the injury, if any, that

Howard suffered because of Mesa's use of mechanical restraints.  A reasonable jury could not

conclude on this record that Mesa applied the mechanical restraints "maliciously and sadistically

to cause harm."[202]  I therefore grant summary judgment in favor of Mesa on the part of Count 4

asserting a claim for excessive force.

### Conclusion

IT IS THEREFORE ORDRED that Defendants' motion to seal **[ECF No. 64] is**
**GRANTED**.

IT IS FURTHER ORDERED that Howard's motion for investigation, which the court

construes as a motion to reopen and enlarge the time to amend pleadings to add new claims and

parties, **[ECF No. 79] is DENIED** without prejudice to Howard's ability to assert new claims

against new parties in a new action.

IT IS FURTHER ORDERED that Howard's evidentiary objections **[ECF No. 71] are**
**OVERRULED**.

IT IS FURTHER ORDERED that the parties' cross-motions for summary judgment

**[ECF Nos. 58, 62] are GRANTED IN PART and DENIED IN PART**:

---

[201] ECF No. 63-6 at 20, ¶ 18 (Mesa declaration); *see* ECF 74 at 18 (continuation form for grievance #20063028455) (Howard states that after he reinjured his back and requested a man-down, Mesa told him "that the nurse said [that he] couldn't request a man-down[,]" Mesa then handcuffed Howard, Howard's property was taken away, he was taken "to the infirmary [to] see . . . the nurse and [then] taken to" his new unit).

[202] *See Hudson*, 503 U.S. at 6.

- Howard's claim alleging Eighth Amendment deliberate indifference to serious medical needs against Groover under Count 5 can proceed to trial;

- Howard's claim alleging First Amendment retaliation against Groover under Count 5 can proceed to trial;

- Summary judgment is granted in favor of Porter on Howard's claim alleging Eighth Amendment deliberate indifference to serious medical needs under Count 1;

- Sgt. Sanchez is dismissed from the amended complaint without prejudice and without leave to amend;

- Summary judgment is granted in favor of Groover, Gutierrez, Drs. Sanchez and Vicuna, Willett, Aranas, Clark, Piscos, Dzurenda, Gentry, and Adams on Howard's claim alleging Eighth Amendment deliberate indifference to serious medial needs under Count 2;

- Summary judgment is granted in favor of Willett and Groover on Howard's claim alleging First Amendment retaliation under Count 2;

- Summary judgment is granted in favor of Cox, Dzurenda, Gentry, Adams, and Tristan on Howard's claim alleging First Amendment free exercise of religion under Count 3;

- Summary judgment is granted in favor of Mesa, Groover, and Willett on Howard's claim alleging Eighth Amendment deliberate indifference to serious medical needs under Count 4; and

- Summary judgment is granted in favor of Mesa on Howard's claim alleging Eighth Amendment excessive force under Count 4.

- The summary-judgment motions are **DENIED IN ALL OTHER RESPECTS**.

IT IS FURTHER ORDERED that this case is referred to the magistrate judge for a

mandatory settlement conference.  The parties' obligation to file their proposed joint pretrial

order is tolled until 20 days after the settlement conference.

_____

U.S. District Judge Jennifer A. Dorsey
Dated: September 30, 2021

38